IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

GERALD RODEWALD

                    Plaintiff,

and

WASTE MANAGEMENT OF WISCONSIN, INC.         OPINION and ORDER

                  Involuntary plaintiff,                     20-cv-843-jdp

  v.

WISCONSIN CENTRAL, LTD.

                  Defendant.

---

Plaintiff Gerald Rodewald was severely injured when the garbage truck he was driving was struck by a locomotive owned by defendant Wisconsin Central, Ltd. Rodewald contends that Wisconsin Central caused the collision by acting negligently in a multiple ways. Rodewald originally sued Wisconsin Central in Rusk County Circuit Court, and Wisconsin Central removed the case to this court on the basis of diversity jurisdiction.[1]

The parties have filed cross motions for summary judgment. Wisconsin Central has moved for summary judgment on all of Rodewald's claims, arguing that some of the claims are preempted by federal or state law and that the rest fail on the merits. Rodewald has moved for partial summary judgment on his claims that Wisconsin Central was negligent for failing to cut

---

[1] The court has jurisdiction under 28 U.S.C. § 1332. Rodewald is a citizen of Wisconsin, involuntary plaintiff Waste Management, Inc., Rodewald's former employer, is a Wisconsin corporation with its principal place of business in Wisconsin, and Wisconsin Central is a Delaware corporation with its principal place of business in Illinois. The amount in controversy is more than $75,000.

vegetation in its right-of-way and for operating the locomotive in excess of 20 miles per hour without auxiliary lights. For the reasons discussed below, the court will grant Wisconsin Central's motion with respect to Rodewald's claims that Wisconsin Central acted negligently by operating its locomotive long-hood forward, by failing to keep a proper lookout, and by failing to install adequate warning devices. There are genuine disputes of material fact that preclude summary judgment on Rodewald's remaining claims, so Wisconsin Central's motion will be denied in all other respects. Rodewald's motion will be denied in full.[2]

## EVIDENTIARY OBJECTIONS

The court begins with Rodewald three objections to Wisconsin Central's summary judgment evidence. First, Rodewald argues that the court should reject Wisconsin Central's expert reports because they were not sworn. But Rodewald was not prejudiced by that alleged deficiency, and Wisconsin Central has resubmitted sworn expert reports. The court will not disregard the reports.

Second, Rodewald argues that the court should reject all of Wisconsin Central's evidence that relies on declarations from Wisconsin Central employees Jacelyn Macewitz, Justin Trush, and Brian Harris because Wisconsin Central failed to identify those witnesses in its initial Rule 26(a)(1) disclosures. The court will deny this request also. Although Wisconsin Central should have disclosed these individuals sooner, Wisconsin Central explained the reasons for the error and has since provided amended disclosures, within the discovery cutoff deadline. In addition, Rodewald has failed to show that he was prejudiced by the delayed

---

[2] Rodewald withdrew his claim that the locomotive engineer did not sound the horn and bells properly, Plt's Opp. Br., Dkt. 56, at 9, so that claim will also be dismissed.

disclosure. Rodewald was aware of the documents and defenses that Wisconsin Central intended to raise and about which Macewitz, Trush, and Harris provided evidence.

Third, Rodewald argues that the court should reject the hearsay evidence from Wisconsin Central employee Steven Brown. In support of its motion for summary judgment, Wisconsin Central relied on an email from Brown to another Wisconsin Central employee regarding whether the locomotive's auxiliary lights were operating at the time of the collision. Dkt. 53-13. Rodewald is correct that Brown's email is hearsay, as Wisconsin Central relies on the email for the truth of Brown's assertions. The court will exclude Brown's email as inadmissible hearsay and will not consider it further in this decision.

UNDISPUTED FACTS

In this section, the court provides an overview of the facts, which are undisputed except where noted. Additional facts will be discussed as they become relevant to the analysis.

The collision at issue occurred on August 29, 2017, in Rusk County, Wisconsin, where Cranberry Lake Road crosses Wisconsin Central's Barron Subdivision line. Rodewald was working for Waste Management, Inc. as a garbage truck driver, and his route included Cranberry Lake Road. By the time of the incident, Rodewald had driven through the intersection of Cranberry Lake Road and the Barron Subdivision at least 65 times, but he had never seen a train at the crossing.

On the morning of the incident, two Wisconsin Central employees, engineer John Wickersham and conductor Jeremy Jako, were operating a Canadian National (CN) 2194 locomotive on the Barron Subdivision. The Barron Subdivision is a single track that generally runs east and west. The locomotive had started the day in Ladysmith, Wisconsin, had traveled

to Poskin, Wisconsin, and was returning eastward back to Ladysmith, without any rail cars, at the time of the collision. Before departing from Poskin, Wickersham ensured that the headlights and auxiliary lights (also called ditch lights) were clean and operational.

Because the Barron Subdivision was a single track and there was no place to turn the locomotive around in Poskin, Wickersham and Jako had to travel back to Ladysmith with the locomotive in the long-hood forward position. Long-hood forward means that the locomotive was running in reverse, and that the engine, crew, and operating controls, which are in the short end, were facing opposite from the direction of movement. The CN 2194 locomotive was designed to be operated safely in either direction, and it was common practice for Wisconsin Central to operative locomotives long-hood forward. The CN 2194 locomotive was equipped with headlights, ditch lights, and a horn on both ends. Wickersham, the engineer, watched the track ahead through a mirror, but he could not see the area ten feet immediately in front of the locomotive. Jako sat on the side of the locomotive closest to the trackside signals. Jako had a better view of the trackside signals and crossings in his mirror, so he reported what he saw to Wickersham.

The Baron Subdivision crosses Cranberry Lake Road at milepost 111.50 on the rail line. Cranberry Lake Road runs north and south and has a speed limit of 55 miles per hour. There is a "whistle post" on the Baron Subdivision several hundred feet before the crossing with Cranberry Lake Road. The whistle post indicates the point at which a locomotive must begin sounding its horn in a specific pattern mandated by federal regulations. On the morning of the collision, Jako told Wickersham when the locomotive reached the whistle post for Cranberry Lake Road crossing, and Wickersham began sounding the locomotive horn in the proper pattern.

Around this same time, at approximately 5:40 a.m., Rodewald was driving his garbage truck north on Cranberry Lake Road, toward the Cranberry Lake Road and Barron Subdivision crossing. It was still dark outside. The Cranberry Lake Road crossing did not have any active warning signs, such as flashing lights or gates, but it had advance warning signs, yield signs, and railroad crossbuck signs north and south of the crossing. Waste Management's rules required drivers to stop at least 15 feet from a rail crossing, roll down their windows, turn off radios and fans, listen for trains, and gradually pull forward to ensure safe passage before proceeding over a crossing. According to Rodewald, he followed his employer's rules. He slowed his truck as he approached the crossing and came to a full stop at the yield sign that was located 12 feet south of the crossing. He rolled down his window to listen for a train horn, but did not hear any horn, bell, or whistle. Rodewald looked left for about three seconds, then he looked right, and then left again before starting across the tracks. Rodewald testified that he could see to the west, the direction from which the CN 2194 locomotive was approaching, to a point where the track bended to the southwest. But he did not see any train lights or any train, so he proceeded onto the tracks. He saw what he described as "the shadow of a train" shortly before the CN 2194 locomotive crashed into his truck. Rodewald estimated that he was traveling five miles per hour at the time of the collision.

According to Jako, he saw the headlights of Rodewald's truck driving north on Cranberry Lake Road toward the railroad crossing about three to five seconds before the collision. Jako assumed that the truck would stop. But according to Jako, the truck drove past the yield and crossbuck signs and entered the crossing without stopping or slowing. When it became clear the truck would not stop, Jako called for Wickersham to engage the emergency brakes. Wickersham had not seen the truck. He activated the train's service brakes at about

5

the time of the collision, and he engaged emergency braking system approximately five seconds later.

The locomotive hit Rodewald's truck and then derailed. Rodewald was seriously injured in the collision. The locomotive was later rerailed and proceeded to Ladysmith.

ANALYSIS

Rodewald contends that Wisconsin Central's negligence caused the accident because: (1) the locomotive was operating at an excessive speed and without its ditch lights illuminated; (2) Wisconsin Central failed to clear vegetation in its right-of-way, obscuring Rodewald's view of the train and the sound of the horn and bells; (3) the locomotive crew failed to keep a proper lookout and should not have been operating long-hood forward; and (4) Wisconsin Central failed to maintain adequate warning devices at the crossing. Wisconsin Central contends that Rodewald's claims fail because they are preempted or because Rodewald lacks evidence to support them. Wisconsin Central also argues that it is entitled to judgment as a matter of law because Rodewald was primarily at fault for the collision. The court addresses each of these arguments below.

**A. Excessive speed and ditch lights**

Rodewald contends that Wisconsin Central acted negligently by operating the locomotive at an excessive speed—33 miles per hour—when it approached the Cranberry Lake Crossing. In response, Wisconsin Central contends that Rodewald's excessive speed argument is preempted by the Federal Railroad Safety Act (FRSA). The FRSA was enacted to provide uniform national standards for railroad operations, and it grants the Secretary of Transportation the authority to prescribe regulations and issue orders relating to railroad

safety. 49 U.S.C. §§ 20101, 20103(a). The FRSA and regulations issued pursuant to it generally preempt state laws covering the same subject matter. *Id.* § 20106; *Michigan Southern Railroad Company v. City of Kendallville, Indiana*, 251 F.3d 1152, 1154 (7th Cir. 2001).

Wisconsin Central argues that the FRSA and 49 C.F.R. § 213.9 preempt Rodewald's claim that the accident was caused by the locomotive's excessive speed because the locomotive's speed complied with federal law. Section 213.9(a) limits the speed at which trains may travel over particular classes of track. The regulation identifies several classes of track and assigns to each class maximum speeds for passenger and freight trains. Wisconsin Central submitted evidence showing that the Barron Subdivision was classified as a class 3 track at the time of the accident. Freight trains can operate up to 40 miles per hours on a class 3 track under federal law. *See* 49 U.S.C. § 213.9(a). Wisconsin Central argues that because its locomotive was traveling under that speed limit, at 33 miles per hour, Rodewald's excessive speed claim is preempted.

Wisconsin Central is correct that Rodewald's excessive speed claim would be preempted if it was undisputed that Wisconsin Central's locomotive was operating at a speed authorized by federal law. *See CSX Transp. v. Easterwood*, 507 U.S. 658, 675 (1993); *Bashir v. Amtrak*, 119 F.3d 929, 933 (11th Cir. 1997); *Eubanks v. Norfolk S. Ry. Co.*, 875 F. Supp. 2d 893, 899 (N.D. Ind. 2012). But Rodewald argues that there is a genuine factual dispute about whether the locomotive's speed exceeded the lawful limit.

First, Rodewald argues that the Wisconsin Central negligently classified the Barron Subdivision as a class 3 track. He argues that the line should have been a class 2 track, which would have imposed a speed limit of 25 miles per hour. But this argument is undeveloped and unpersuasive. The Federal Railroad Administration sets guidelines for track class designation,

7

and federal rules require railroads to ensure that its tracks conform to specific classification requirements. *See* 49 C.F.R. § 213.5. The different classes of track are defined by their gage, alignment, curvature, surface uniformity, and the number of crossties per length of track. *Id.* §§ 213.53–213.369; *Easterwood*, 507 U.S. at 673. Wisconsin Central submitted evidence showing that the Barron Subdivision was built to class 3 specifications and that the Federal Railroad Administration has never taken exception to the line's class 3 designation. Rodewald does not identify any features of the Barron Subdivision that would disqualify the line from being designated as a class 3 track. In short, Rodewald has identified no evidence to support his argument that Wisconsin Central negligently classified the Barron Subdivision as a class 3 track.

Second, Rodewald argues that federal law does not preempt a claim against a railroad if a train fails to slow or stop when confronted with a "specific, individual hazard." *See Easterwood*, 507 at 675, n.15. A specific, individual hazard is a unique, particular danger, such as a child standing on the tracks, *Anderson v. Wisconsin Cent. Transp. Co.*, 327 F. Supp. 2d 969, 978 (E.D. Wis. 2004), or a vehicle stuck on the track ahead of an approaching train, *Partenfelder v. Rohde*, 2014 WI 80, ¶ 53, 356 Wis. 2d 492, 523, 850 N.W.2d 896. The "general danger" of a railroad crossing does not qualify as a specific, individual hazard. *Id.* Rodewald cites a couple of cases involving "specific, individual hazards," but he fails to develop any argument about why his approach to the Cranberry Lake Road crossing would qualify as one. His approach, by itself, it not enough. Trains are not required to slow or stop merely because they see a vehicle approaching a crossing. *Brunner v. Minneapolis, St. P. & S.S.M.R. Co.*, 240 F.2d 608, 612 (7th Cir. 1957). Train conductors and engineers are instead entitled to assume that a vehicle approaching the track will stop, look, and listen for a train, and will yield to the train's right-

of-way. *Id.* Thus, Rodewald has not shown that the locomotive used excessive speed in the face of a specific, individual hazard that.

Rodewald's third argument has more traction. Rodewald argues that, regardless whether the Barron Subdivision was a class 3 track or there was a specific, individual hazard, Wisconsin Central's locomotive was restricted to a speed limit of 20 miles per hour because its ditch lights were not turned on. This argument is based on 49 C.F.R. § 229.125, which states that "each lead locomotive operated at a speed greater than 20 miles per hour over one or more public highway-rail crossings shall be equipped with operative auxiliary lights," in addition to its headlights. Federal regulations also mandate that ditch lights conform to a specific location and brightness. *Id.* § 229.125(d)(1), (2). Rodewald argues that because the locomotive's ditch lights were not illuminated, its speed of 33 miles per hour violated federal regulation. Rodewald also raises a stand-alone negligence argument related to Wisconsin Central's failure to have illuminated ditch lights. He contends that the lack of ditch lights contributed to Rodewald's inability to observe the locomotive until it was too late.

Wisconsin Central responds that Rodewald's arguments fail because the locomotive's ditch lights *were* illuminated. But there is a genuine factual dispute regarding whether the ditch lights were illuminated when the locomotive approached Cranberry Lake Road crossing.

On the one hand, the locomotive's conductor and engineer both stated that the ditch lights were clean and operational when they left Ladysmith and Poskin earlier in the day, and that the ditch lights were on at the time of the collision. They stated that they would have noticed if the ditch lights were off because ditch lights provide a significant amount of light, particularly when it is dark outside like it was at the time of the collision.

9

But on the other hand, photographs taken by a state trooper shortly after the collision showed the locomotive with its headlight on and its ditch lights off. The photos also showed that one of the ditch lights was damaged on the long-hood forward end of the locomotive. Wisconsin Central has provided no explanation for why the ditch lights were off at the time the photographs were taken. In addition, data retrieved from the locomotive's event recorder, similar to a flight data recorder on an aircraft, indicated that the auxiliary and ditch lights were off at the time of the collision. Wisconsin Central argues that the event recorder did not record ditch lights activity, but its only evidence to support that assertion is the inadmissible hearsay statement of one of its employees. And Rodewald's expert has given the opinion that the data sheet display shows that the ditch lights were connected to the event recorder. Second Ogden Dec., Dkt. 46, ¶ 9. Wisconsin Central also argues that the event recorder was not required by federal regulation to record auxiliary light activity, but whether it was required to or not does not establish whether it actually did. As Rodewald points out, the event recorded also was not required under federal regulation to show headlight activity, 49 C.F.R. § 229.135(b)(1)), but it did. Thus, there is a genuine factual dispute whether the ditch lights were on at the time of the collision.

There is also a genuine factual dispute regarding whether the lack of ditch lights contributed to the collision. Wisconsin Central argues that because the locomotive had active headlights, horn and bells, the usage of ditch lights was irrelevant to Rodewald's ability to see the train. But Rodewald's expert gave the opinion that locomotive headlights alone are not distinctive, that horns and bells are only a secondary alerting system, that activated ditch lights reduce crossing crashes, and that the absence of ditch lights contributed to Rodewald not seeing the locomotive soon enough to avoid the collision. First Lee Dec., Dkt. 48; Lee Addendum

Rep., Dkt. 50, at 2. Lee explains. Rodewald's evidence is sufficient to raise a genuine factual dispute about whether the lack of ditch lights was a cause of the collision.

## B.  Failure to clear vegetation

Rodewald contends that Wisconsin Central violated Wis. Stat. § 195.29(6), which requires railroads to clear vegetation in their right-of-way. The statute states specifically that railroads are required to keep their right-of-way

> clear of brush or trees for a distance of not less than 330 feet in each direction from the center of its intersection at grade with any public highway to provide an adequate view of approaching trains or railroad track equipment from the highway to provide an adequate view of approaching trains or railroad track equipment from the highway.

Wis. Stat. § 195.29(6). Rodewald submitted the expert report of Zachary Bingen, a professional engineer retained by involuntary plaintiff Waste Management, who investigated the accident scene, surveyed the general topography, and took photographs and videos to document vegetation in Wisconsin Central's right-of-way near the Cranberry Lake Road crossing. Bingen Rep., Dkt. 18-2, at 4–6, 8. (Wisconsin Central's right-of-way extends 100 feet south of the track west of Cranberry Lake Road.) Bingen identified several areas in Wisconsin Central's right-of-way that were within 330 feet to the west of the crossing and that were not clear of brush and trees. Bingen gave the opinion that the vegetation, which included evergreen trees, was of sufficient height, width, and density, that it would have obscured the ability of a motorist traveling north on Cranberry Lake Road to see a locomotive traveling east on the Barron Subdivision.

Wisconsin Central argues that even if there was vegetation in its right-of-way, the vegetation did not obscure Rodewald's view of the train or cause the collision. Wisconsin Central points to Rodewald's deposition testimony, during which he testified that when he

11

stopped and looked for trains at the crossbuck and yield sign, he had an unobstructed view down the track to where the track bends southwest. Wisconsin Central argues that the bend is 535 feet down to the west of the crossing. So, Wisconsin Central argues, Rodewald's view could not have been blocked by any vegetation growing within 330 feet west of the crossing.

But contrary to Wisconsin Central's argument, Rodewald did not testify at his deposition that he had an unobstructed view could see 535 feet down the tracks. He did not identify any specific distance, he was not asked about trees, bushes, or any other obstruction. The actual exchange was as follows:

> Q: When you say [it was] really foggy, how far down the tracks were you able to see?
>
> A: I was able to see I would say almost close to that — close to the corner there or on it, yeah, that corner on the left, the left-hand side of the corner. I was able to see close to that corner.
>
> Q: When you say the corner, you mean there's a bend in the tracks on the left-hand side. Is that what you're saying?
>
> A: Yes.
>
> Q: And you're saying that you could almost — you could see — could you see that corner or could you — is it your estimate that you could almost see that corner?
>
> A: I can see the corner.
>
> Q: Okay. And about how far from the grade crossing is the corner?
>
> A: It's hard. It depends. I can't really say how far.

Rodewald Dep., Dkt. 22, at 7.

Rodewald referred to a "corner," but his testimony is too vague to determine the precise location of the corner. And Wisconsin Central submits no evidence that Rodewald would have been able to see 535 feet down the track in the dark. His testimony is simply too vague to

provide support for Wisconsin Central's assertion that Rodewald had an unobstructed view of the locomotive approaching the crossing.

Wisconsin Central also argues that the trees and brush more than 12 feet south of the crossing, where the yield sign is located, are irrelevant because they would not have affected Rodewald's ability to see the train from his position at the yield sign. But again, one of Rodewald submitted an expert report that disputes Wisconsin Central's assertion. Dkt. 19. Kenneth Drevnik, an accident reconstruction expert, gave the opinion that the vegetation would have obscured both Rodewald's ability to see the train approaching both before and at the crossing, particularly if the ditch lights were off. The expert opinions are sufficient to create a genuine factual dispute regarding whether Wisconsin Central's negligently failed to clear vegetation in its right-of-way and whether the vegetation contributed to the collision.

## C.  Failure to keep a proper lookout and operating long-hood forward

Rodewald argues that Wisconsin Central was negligent for operating the locomotive long-hood forward over a lengthy stretch of track during the dark. He argues that if the locomotive had been facing forward, the engineer and conductor would have seen him sooner and could have stopped or slowed the locomotive to avoid or lessen the impact of the collision. Rodewald also contends that the engineer and conductor were negligent for failing to keep a proper lookout. Wisconsin Central responds that Rodewald's negligence claim based on the locomotive operating long-hood forward is preempted by the federal Locomotive Inspection Act, which governs locomotive design. 49 U.S.C. § 20701–20703.

Rodewald's claim is not preempted by the Locomotive Inspect Act. The Locomotive Inspection Act and its accompanying regulations provide specifications for nearly every aspect of locomotive design, so the Act preempts all state law claims related to the design of

13

locomotives. 49 C.F.R. § 229.125(a); *Union Pac. R.R. Co. v. Motive Equip., Inc.*, 2006 WI App 58, ¶ 12, 291 Wis. 2d 236, 244, 714 N.W.2d 232, 236 (Locomotive Inspection Act preempted claim involving negligent design of a refrigerator in locomotive cab). But Rodewald is not challenging the design or construction of the CN 2194 locomotive, or even its ability to operate in the long-hood forward position. His claim relates to the negligent operation of the locomotive under the specific circumstances—it was a relatively long stretch of track with a 40 miles per hour speed limit; the track crossed public roads that had no active warnings; and it was dark outside. Wisconsin Central has cited no cases in which a court concluded that a similar negligence claim was preempted by the Locomotive Inspection Act. Wisconsin Central instead cited several cases in which courts dismissed negligence claims based on a train operating long-hood forward because the plaintiff had failed to show that operating long-hood forward was negligent under the circumstances. *See, e.g.*, *Graham v. S. Pac. Transp. Co.*, 619 So. 2d 894, 898 (La. Ct. App. 1993); *Brennan v. Wisconsin Cent. Ltd.*, 227 Ill. App. 3d 1070, 1083, 591 N.E.2d 494, 503 (1992); *Garza v. Norfolk S. Ry. Co.*, 536 F. App'x 517, 521 (6th Cir. 2013). Those cases did not address the Locomotive Inspection Act.

That being said, the reasoning from those cases applies to Rodewald's claims because, like the plaintiffs in those cases, Rodewald has not shown that operating the train long-hood forward interfered with the crew's ability to maintain a proper lookout. Rodewald's expert, Brandon Ogden, gave the opinion that Wisconsin Central acted negligently by operating long-hood forward over a grade crossing with a 40 miles per hour speed limit because the crew had reduced ability to see and react to Rodewald's truck. Ogden Rep., Dkt. 30, at 7–8. But it is undisputed that the conductor, Jako, saw Rodewald's vehicle traveling north on Cranberry Lake Road when the locomotive was several hundred feet from the crossing. Jako continued to watch

the vehicle approach and, when it became clear that the truck would not stop, Jako called for Wickersham to engage the emergency brakes. Rodewald has submitted no evidence showing that Jako would have had a better view or would have responded differently had the locomotive been traveling short-hood forward. As discussed above, Jako was entitled to assume that Rodewald would stop when he reached the tracks. Wis. Stat. § 346.44 (drivers have duty to look and listen for train before proceeding through a crossing). Rodewald also submitted no evidence that the locomotive would have been able to stop more quickly or would have avoided the accident if it had been traveling short-hood forward or if the crew had maintained a better lookout. The locomotive crew was required to keep a proper lookout for individuals and vehicles in the vicinity of the tracks, but as discussed above, they were not required to slow or engage the emergency breaks until it became clear that Rodewald would not stop. *Brunner*, 240 F.2d at 612; *Keegan v. Chicago, M., St. P. & P. Ry. Co.*, 251 Wis. 7, 12, 27 N.W.2d 739, 742 (1947) (train crew not negligent where, [a]s soon as it was evident the truck was not going to stop, every reasonable precaution was taken by the engine crew to prevent the collision"). Rodewald has submitted no evidence that the crew failed to maintain a proper lookout or that operating long-hood forward reduced the crew's ability to do so. Rodewald has no evidence that Wisconsin Central's train crew failed to keep a proper lookout or take appropriate action to prevent the collision.

**D. Failure to maintain adequate warning devices at the crossing**

Rodewald argues that Wisconsin Central was negligent by failing to provide adequate warnings and active protective devices at the crossing, such as a light, gate, barrier, watchperson, or flagger. Under Wisconsin law, railroads have a duty to install and maintain adequate warning devices at public crossings. *Kurz v. Chicago, M., St. P. & P. R. Co.*, 53 Wis.

2d 12, 21, 192 N.W.2d 97, 101–02 (1971). Wisconsin Central responds that it is immune to Rodewald's claim under Wis. Stat. § 195.28(1). That statute provides that "[a]ny crossing protection installed or maintained as approved by the [Office of the Commissioner of Railroads], whether by order or otherwise, shall be deemed adequate and appropriate protection for the crossing." Under the statute, if Wisconsin's Office of the Commissioner of Railroads (OCR) directs that a crossing be guarded in a particular manner, and the railroad does so, the railroad is immune from challenges to the adequacy of warning devices. *See Anderson v. Wisconsin Cent. Transp. Co.*, 327 F. Supp. 2d 969, 981 (E.D. Wis. 2004). Wisconsin Central argues that because the warning measures at Cranberry Lake Road crossing complied with orders it received from OCR, § 195.28(1) immunity applies.

Wisconsin Central relies on two OCR orders: (1) a 1999 OCR order; and (2) a 2012 OCR order. The 1999 OCR order required Wisconsin Central to install and maintain new retroflective crossbucks at all of its crossings that had only passive warning devices. Dkt. 44-3. The OCR order was pursuant to a statewide upgrade of warning signs at all crossings, and the OCR included a disclaimer that OCR "had not conducted an investigation of each specific crossing, but [was] instead providing materials . . . for a system-wide upgrade in warning devices as passive crossings." *Id.* at 4. In another case involving a Wisconsin Central crossing, the Eastern District of Wisconsin concluded that the 1999 OCR order did not provide immunity to Wisconsin Central because the Wisconsin Supreme Court had limited immunity under § 195.28(1) to situations in which the OCR was based on a review of the safety requirements of the specific crossing involved in the case. *Wisconsin Cent. Ltd. v. Acuity*, No. 09-CV-966, 2011 WL 208404, at *3 (E.D. Wis. Jan. 21, 2011) (*citing Gamble–Skogmos, Inc. v. Chi. & Nw. Transp. Co.,* 71 Wis. 2d 767, 238 N.W.2d 744, 747–78 (Wis. 1976)). The Eastern District court held

16

that because the 1999 OCR order applied to all railroad crossings in Wisconsin, immunity was not appropriate.

This court need not decide whether the 1999 OCR order provides immunity to Wisconsin Central, however, because the 2012 OCR order is sufficient to do so. The 2012 OCR order provided Wisconsin Central notice that OCR was investigating the safety devices at 36 crossings, including the Cranberry Lake Road crossing. Dkt. 44-4. At the time that the OCR announced the investigation, Wisconsin Central had installed the crossbucks and yield sign that existed at the time of the collision at issue in this case. OCR reviewed the safety devices, but the OCR did not order Wisconsin Central to make any changes or additions to the crossbucks and yield sign installed at the Cranberry Lake Crossing.

Rodewald argues that Wisconsin Central should not be permitted to rely on the 2012 OCR order under 23 U.S.C. § 409, a statute that prohibits omission into evidence of any "report, survey, schedule, list, or data" compiled for the purposes of federally funded crossing improvements. But the 2012 OCR order was not a report, survey, schedule, or anything else associated with a potential federal project, so § 409 does not apply.

Rodewald also argues that Wisconsin Central has provided insufficient information about the OCR's investigation of the crossing in 2012 to determine whether the OCR actually reviewed and made any determinations with respect to the specific crossing. He also argues that because Wisconsin Central had installed the crossbucks and yield sign before receiving the 2012 OCR order, Wisconsin Central cannot honestly say that it relied on the OCR's notice of investigation to decide that the safety warnings at the crossing were adequate. But neither argument is persuasive. Under § 195.28(1), Wisconsin Central was not legally obligated to install additional warnings if the OCR "approved" of the crossing protections "by order or

otherwise." The OCR told Wisconsin Central that it was going to investigate the safety devices at Cranberry Lake Road crossing, but OCR later declined to order Wisconsin Central to install additional warning devices at the crossing. Wisconsin Central was justified in relying on the OCR's decision as approval of the crossing safety warnings. Accordingly, Rodewald's challenge to the adequacy of warning devices at the crossing is barred by § 195.28(1).

### E. Comparative negligence

Wisconsin Central argues that, even if a jury were to find that Wisconsin Central was negligent and that its negligence contributed to the accident, Rodewald is barred from recovering because his failure to hear and see the approaching locomotive was more than half the cause of his own injuries. But there are several disputed issues of fact regarding how much the lack of ditch lights, the locomotive's speed, and the vegetation around the tracks contributed to the collision. And the apportionment of comparative negligence is generally a matter left to the jury. *Phelps v. Physicians Ins. Co. of Wisconsin*, 2005 WI 85, ¶ 45, 282 Wis. 2d 69, 94, 698 N.W.2d 643, 656. Accordingly, the court cannot conclude on the record that Rodewald was more responsible for the collision than Wisconsin Central was.

### ORDER

IT IS ORDERED that:

1. Plaintiff Gerald Rodewald's motion for partial summary judgment, Dkt. 17, is DENIED.

2. Defendant Wisconsin Management of Wisconsin, Inc.'s motion for summary judgment, Dkt. 34, is GRANTED with respect to plaintiff's claims that defendant acted negligently by operating its locomotive long-hood forward, failing to keep a proper lookout, and failing to install adequate warning devices. The motion is DENIED in all other respects.

Entered February 15, 2022.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge